**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARCO MALDONADO** | : | |
| **Plaintiff,** | : | **Civil Action No. 22-** |
| | : | **JURY TRIAL DEMANDED** |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| **DETECTIVE MICHAEL CAHILL** | : | |
| **DETECTIVE HERBERTO APONTE** | : | |
| **OFFICER BRUCE DOUGHERTY** | : | |
| **OFFICER BRUCE DENOBLE** | : | |
| **OFFICER ROBERT AHRNDT** | : | |
| **OFFICER JOHN BROADBENT** | : | |
| **C.E.S. RICHARD HENDERSON** | : | |
| **A.D.A. ROBERT CAMPOLONGO** | : | |
| **A.D.A. JOHN DOES** | : | |
| **OFFICERS JOHN DOE(S),** | : | |
| **Individually and as police officers for the** | : | |
| **City of Philadelphia,** | : | |
| **Defendants.** | : | |

## COMPLAINT

### I.    PRELIMINARY STATEMENT

1.      In October 1993, Plaintiff Marco Maldonado was wrongfully convicted and sentenced to life imprisonment for a crime he did not commit. More than twenty-seven years later, upon consideration of Mr. Maldonado's Post Conviction Relief Action petition and with the agreement of the Commonwealth, Mr. Maldonado's conviction was finally vacated.  Philadelphia police detectives violated his constitutional rights and, along with the prosecution, undermined the fairness of the plaintiff's trial process and more specifically, Mr. Maldanado was induced into an unknowing, unintelligent, and involuntary plea of guilt. Plaintiff brings this action under 42 U.S.C. §1983 seeking redress for the extraordinary misconduct of Defendants Dougherty, DeNoble, Ahrndt, Broadbent, Cahill, Aponte, Henderson, Campolongo and Doe(s), who coerced Mr. Maldonado's

1

confession, fabricated evidence, engaged in deliberate deception by concealing and/or suppressing material evidence, employed unlawful investigative techniques, presented false testimony, and, together with other Philadelphia police officers, denied the plaintiff due process of law and a fair trial. The actions and conduct of the defendant officers were the results of policies, practices, customs, and deliberate indifference on the part of Defendant City of Philadelphia, including the failure to properly train and supervise officers assigned to investigate homicides, and the failure to take disciplinary and remedial action against the defendant detectives and other police officers who commit serious misconduct and abuses of authority.

## II.    JURISDICTION

2.      This action is brought pursuant to 42 U.S.C. §1983. Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343(1), (3), (4) and the aforementioned statutory provision. Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367(a) to adjudicate state law claims.

## III.    PARTIES

3.      Plaintiff Marco Maldonado is a resident of Philadelphia, Pennsylvania and at all times relevant to this action was in the Eastern District of Pennsylvania.

4.      Defendant City of Philadelphia is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police Department which at all times relevant to this action employed Defendants Bruce Dougherty, Bruce DeNoble, Robert Ahrndt, Broadbent, Michael Cahill, Herberto Aponte, Richard Henderson, and Doe(s).

5.      Defendants Dougherty, DeNoble, Ahrndt, Broadbent, Cahill, Aponte, Henderson,

and Doe(s) ("the defendant officers") were at all times relevant to this action police officers or detectives for the Philadelphia Police Department acting under color of state law. The defendant officers are being sued in their individual capacities.

6.      At all relevant times, all defendants were acting in concert and conspiracy and their actions deprived the plaintiff of his constitutional and statutory rights.

7.      At all times relevant to this Complaint, all defendants acted under color of state law.

## IV.    FACTUAL ALLEGATIONS

### The Murder

8.      On December 23, 1992, Alberto Gonzales Sr. ("Gonzales Sr.") was found shot to death in his home.

9.      Gonzales Sr. was found dead in the second-floor front bedroom of his home at 2831 North Orkney Street in Philadelphia after he was shot once in the shoulder. The victim's son, Alberto Gonzales Jr. ("Gonzales Jr."), found his father's body, and a neighbor called the police.

### The Police Investigation of Mr. Maldonado

10.     On the morning of December 23, 1992, Police officers Dougherty and DeNoble claimed to have seen Plaintiff removing a handgun from his jacket and tossing it into an abandoned car. They claimed that a single .38 bullet was found in plaintiff's pocket.

11.     Mr. Maldonado subsequently posted bail and went home on the same day; he was not a suspect in the murder at that time.

12.      After police interviewed Mayra Camacho, who claimed to have witnessed Mr. Maldonado enter Gonzales Sr.'s home, however, Mr. Maldonado was suspected in

Gonzales Sr.'s murder.

13.     On December 28, 1992, Police officers Ahrdt and Broadbent were allegedly told by an unidentified Black woman that Mr. Maldonado was wanted for murder. They claim to have seen Mr. Maldonado standing on the corners of Mutter and Cambria streets and approached him when Mr. Maldonado started running. They chased Mr. Maldonado into an abandoned house, apprehended him, and took him into custody for questioning.

14.     According to Mr. Maldonado, he was not on the corner of Mutter and Cambria streets that night. He was actually asleep in the home of Carmen Whitely, as a result of being highly intoxicated.

15.     In the early morning of December 29, 1992, police officers conducted a warrantless arrested of Mr. Maldonado, questioned him at police headquarters for approximately 18 hours, about the Gonzales Sr.'s murder, at which time Mr. Maldonado allegedly confessed to shooting and killing Gonzales Sr.

16.     At the time of Gonzales Sr.'s murder, Mr. Maldonado was 19 years old and addicted to drugs. He has always maintained that he did not murder Gonzales Sr., and he does not remember giving a statement to the police.

17.     Although Mr. Maldonado admits that the signature on his alleged statement is his, Mr. Maldonado does not remember giving the police a statement because he was under the influence at the time the police officers brought him into the police station. Mr. Maldonado's cousin and another man can confirm that Mr. Maldonado was high on PCP and Xanax on the night he was questioned by the police.

18.     Mr. Maldonado was arrested shortly after midnight on December 29, 1992, and his interview with Detective Michael Cahill began at 4:30 am; the statement was signed at

5:45 am. It is highly likely that Mr. Maldonado was still intoxicated at the time of the interview and statement—indeed, he has no recollection of making it.

19.      There was no forensic evidence linking Mr. Maldonado to the murder, and only one person Mayra Camacho, of the many people interviewed claimed that they saw Mr. Maldonado near Gonzales Sr.'s home near the time of the murder.

20.      Ms. Camacho's credibility was and is questionable at best because her statement is not consistent with the statements of other witnesses.

21.      On September 30, 2017, witness Mayra Camacho provided an affidavit recanting her prior statement inculpating Mr. Maldonado in the murder of Alberto Gonzales Sr. She indicated, among other things, that Maldonado had been with her in a house across the street from the Gonzales Sr.'s home on the night of the murder and had knocked on a neighbor's door but left when there was no answer. She later heard two gunshots, and then observed Nestor Sanchez leave Gonzales Sr.'s house—Sanchez threatened to kill Camacho if she would not place the blame on Mr. Maldonado.

22.      Several days later, Alberto Gonzales Jr. approached Camacho and brought her to the police, purportedly at gun point. He had been informed by the detectives in the case that he was a suspect in his father's murder and had been locked up for several days. Camacho, afraid for her life, told the detectives that Mr. Maldonado was had committed the crime.

23.      It was not until Camacho's recantation that Mr. Maldonado learned that the police had suspected Gonzales Jr. in his father's death until Camacho shifted the blame. This exculpatory information was never disclosed to the defense, nor were any statements provided by Gonzales Jr. or any other evidence that may have led to the police's initial

suspicion that he had killed Gonzales Sr., in blatant violation of the prosecution's duties under Brady.

24.     The Commonwealth destroyed exculpatory fingerprint evidence that was recovered from the entryway through which the purported assailant entered. In addition, the Commonwealth withheld evidence from Plaintiff Maldonado of alternative suspects that were discovered by the detectives through police investigation. The Commonwealth fabricated evidence/testimony regarding the chain of custody of the bullet fragment recovered from the decedent.

25.     The Commonwealth also withheld evidence of an investigation into police Officers Bruce Dougherty and Bruce DeNoble, who were dismissed for corruption only months after they participated in Maldonado's conviction. Detective Michael Cahill, who took Maldonado's disputed statement, has also been repeatedly accused of misconduct.

### The Trial and Sentencing

26.     On October 5, 1993, Plaintiff Marco Maldonado, through his trial counsel Mr. Kolansky litigated a Pre-Trial Motion to Suppress Evidence before the Honorable Francis A. Biunno. The subject of the motion was Mr. Maldonado's coerced confession. The motion was denied the next day.

27.     Upon advice of trial counsel, Plaintiff Maldonado then agreed to plea to Murder in the Second Degree and the Commonwealth agreed not to proceed against Plaintiff on Murder in the First Degree or a potential death sentence.

28.     According to Mr. Maldonado, he pled guilty to Murder in the Second Degree because his lawyer was ineffective, and he was told that he was facing the death penalty.

29.     Plaintiff Marco Maldonado was sentenced to Life Imprisonment, pursuant to the

plea bargain.

## Post-Trial Proceedings

30.    On February 21, 1995, Plaintiff filed a PCRA petition complaining that "Mr. Kolansky incorrectly told Plaintiff that he would be eligible for parole in 8 years on his Life Sentence. He alleged that Mr. Kolansky failed to conduct adequate pre-trial investigation and did not consult with Mr. Maldonado until right before trial.

31.    Mr. Maldonado's first PCRA motion was denied but he does not give up and did not stop claiming his innocence.  In subsequent PCRA petitions, Mr. Maldonado has repeatedly explained that this trial counsel, Jeffrey Kolansky, was ineffective because he failed to conduct a pre-trial investigation, he did not visit Mr. Maldonado when he was in custody before the guilty plea, and he told Mr. Maldonado that if he pled guilty to second-degree murder, he would be eligible for parole in eight years.

32.    In 2006, Mr. Maldonado filed his first habeas petition. In it, he raised three claims of ineffective assistance, charging that plea counsel: (1) falsely represented to Petitioner that he would be eligible for parole after serving only eight years of his life term; (2) did not conduct an adequate pre-trial investigation; and (3) neglected to act on Mr. Maldonado's request that counsel file a motion to withdraw his guilty plea. The District Court rejected that petition, holding that the state courts' adjudication of each of these issues was reasonable. *Maldonado v. Warden*, SCI Graterford, No. CIV.A.06-1203, 2007 WL 475819 (E.D. Pa. 2007).

33.    Since his conviction, Mr. Maldonado continued to gather new evidence about his case and litigate *pro se* for his freedom.

34.    In November 2017, the Third Circuit issued an exceedingly rare order granting

leave to file a second or successive habeas petition with respect to (1) a claim under *Brady v. Maryland* and (2) a freestanding innocence claim.

35.     After more than twenty-seven years, upon consideration of Mr. Maldonado's habeas petition and his latest Post Conviction Relief Action petition, the Commonwealth agreed that Mr. Maldonado's PCRA petition should be granted. Mr. Maldonado's conviction was finally vacated, upon the condition that Mr. Maldonado plead no contest to Murder in the Third Degree.

36.     Essentially, Mr. Maldonado was confronted with two options: remain in custody for up to three more years pending a new trial or enter a *nolo contendere* plea to a reduced charge for a prison sentence of less time than he had already served. Mr. Maldonado chose the latter.

37.     On April 19, 2021, Mr. Maldonado entered a "no contest" plea to Third Degree Murder and was sentenced to 10 to 20 years. Mr. Maldonado served 27 years for a crime he did not commit.

38.     The actions and conduct of the individual defendants as described above violated the plaintiff's Fourteenth Amendment right to due process of law and a fair trial.

39.     The fabrication of and tampering with evidence by the defendant officers –a) the planting of the handgun and bullet claimed to have seized form Mr. Maldonado, b) the fabricated probable cause for the arrest of Mr. Maldonado on December 28, 1992 and c) the false coerced confession of Mr. Maldonado– violated the plaintiff's right to due process of law and a fair trial.

40.     The defendant officers were deliberately deceptive by concealing and/or suppressing critical evidence – including evidence linking suspects other than Mr.

Maldonado to the murder of Gonzales, Sr. – and thus violated the plaintiff's right to due process of law and a fair trial.

41.     Defendants' failure to conduct a reasonably thorough investigation that considered evidence negating the existence of grounds to prosecute Mr. Maldonado, including the testimony and evidence referenced above, denied the plaintiff a fair trial.

42.     The concealment and/or failure to disclose the relevant and material evidence described above violated the plaintiff's right to due process of law and a fair trial.

43.     Defendants failed to advise the District Attorney's Office and criminal defense counsel of material evidence that negated the existence of probable cause to initiate the prosecution of Mr. Maldonado and provided false, misleading and incomplete information to the District Attorney's Office that resulted in the initiation of a murder prosecution of Mr. Maldonado.

44.     As a result of the actions and inactions of the defendant officers, Marco Maldonado was compelled to stand trial in a capital murder case, causing him substantial harms.

**The PPD's pattern and practice of unconstitutional misconduct in homicide investigations, including the fabrication of evidence, coercion and threats to secure false statements from witnesses and suspects, failure to conduct proper investigations, and suppression of exculpatory evidence**

45.     For many years dating back at least to the 1970's, and continuing well beyond the time of the investigation of Gonzales, Sr.'s murder, the City of Philadelphia, had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses,

suspects, and arrestees.

46.     This policy, practice, or custom involved the use of various techniques to coerce incriminating statements, including without limitation: isolation; separating juvenile or otherwise vulnerable suspects or witnesses from friends and family; subjecting individuals to needlessly prolonged interrogations; making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement and/or be given favorable treatment; the use or threat of physical violence; authoritative assertions of a suspect's guilt, including without limitation confrontation with false inculpatory evidence; and providing false assurances—including to juveniles and other vulnerable people—that the suspect or witness will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

47.     These practices were well known to the City of Philadelphia and its policymakers with respect to criminal investigations and prosecutions as a result of newspaper investigations including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

48.     Various cases demonstrate that this misconduct was pervasive within the Philadelphia Police Department at time of Mr. Maldonado's 1993 trial, and, upon information and belief, the misconduct described below was committed with the knowledge of Homicide Unit and PPD supervisors or because of their deliberate indifference to this misconduct.

    a.  **Anthony Wright** (CP-51-CR-1131582-1991). Mr. Wright had been convicted of the rape and murder of an elderly woman based on misconduct by homicide

detectives including the tampering with evidence, coercive witness interrogation, planting evidence and numerous other actions that denied Mr. Wright a fair trial. After spending nearly twenty-five years in prison, Mr. Wright was exonerated by DNA evidence.

b. **Carlos Hernandez** (CP-51-CR-0302131-1991) & Ed Williams. A woman and her boyfriend were robbed at gunpoint by two men and her boyfriend was shot. Detectives interrogated a key witness, Juan Sanchez, and extracted a statement from him implicating Carlos Hernandez and another man. Mr. Sanchez described the circumstances of his statement as follows: the detective held him in custody and interrogated him for three days, without food or water; he was denied use of the bathroom and had to urinate on the floor; the detective hit him several times. After coercing Mr. Sanchez's statement, the detective interrogated Mr. Hernandez and obtained a statement from him implicating Ed Williams. Mr. Hernandez described the circumstances of his statement as follows: the detective had him handcuffed to a chair and held him without water, food, or use of a bathroom; the detective punched him in the face and pressed his foot on Mr. Hernandez's crotch until he relented and signed the statement. Later it was proved that Mr. Williams was in a secured drug treatment facility at the time of the crime.

c. **Jackie Combs Jr.** PPD detectives, coerced four young witnesses into testifying against Mr. Combs for a murder that he denies committing. One of those witnesses, just 15 at the time, has told reporters that she felt "it's my fault, because I changed my story, saying this man killed this guy [and] knowing he

didn't do it." The witnesses, who gave varied accounts of the killing, have explained that their statements were the result of physical and verbal abuse by detectives.

d. **Willie Veasy** (CP-51-CR-0641521-1992). Mr. Veasy was convicted of a murder that occurred in South Philadelphia while he was working at a popular and busy restaurant. Mr. Veasy was interrogated by detectives until he provided a "confession." Mr. Veasy has described that the detective isolated him in an interrogation room where the detective smacked him around and kicked his testicles several times until Mr. Veasy agreed to sign the "confession."

e. **Percy St. George** (CP-51-CR-1012571-1993). In investigating a murder, the detective obtained a statement from a witness who, because there were warrants out for his arrest, signed the statement under a friend's name: David Glenn. As trial approached, PPD officers picked up the actual David Glenn. At the station, the detective coerced the real David Glenn into signing a new false statement saying he saw the crime and identifying Mr. St. George from a sham photo array prepared by the detective. After David Glenn testified regarding the detective's misconduct and disavowed the statement the detective had coerced him to sign, the detective notified the Court and the Commonwealth of his intention to assert his 5th Amendment right against self-incrimination to avoid having to testify about his actions in that case. Shortly after receiving this letter from the detective's counsel, the prosecution dismissed all charges against St. George, but the detective remained with the PPD through September 1996.

f. **Donald Ray Adams** (CP 51-CR-0743812-1991). Mr. Adams was charged and

convicted in the 1990 murders of Darryl Patterson and Thomas Winn. The initial investigation of the case did not produce a suspect and in June, 1991 PPD Detectives David Clark and Igor Alfimow were assigned to re-investigate the matter. These detectives secured a statement from an alleged witness, Donna Benjamin, implicating Mr. Adams. Based almost entirely on this testimony, Mr. Adams was convicted and sentenced to life imprisonment. In fact, the statement from Ms. Benjamin was coerced and false and some years later she recanted. In 2007, the Court of Common Pleas granted post- conviction relief based on the testimony of Ms. Benjamin that the detectives threatened her with incarceration, promised that her open criminal charges would be dismissed, and offered her financial and other material support for her testimony. The detectives ignored the fact that other witnesses provided physical descriptions of the assailant as over six feet tall, thin, light skinned and in his 20's. Mr. Adams was 5'4", 200 pounds, dark skinned and in his 30's. Moreover, there was evidence pointing towards another "Don Ray" (Don Ray Bennett) who lived in the neighborhood, fit the description of the assailant, and whose family had been in disputes with the victims. Indeed, Ms. Benjamin stated that it was Don Ray Bennett in her recantation. At a retrial, Mr. Adams was acquitted of all charges. In a subsequent civil suit for malicious prosecution, the matter was settled and Mr. Adams received compensation for his wrongful conviction.

g. **Andrew Swainson** (CP-51-CR-0431331-1988). In 1989, Andrew Swainson was convicted of murder on the statement of a single eyewitness, Paul Presley— an original suspect arrested for the shooting moments after it occurred, covered

in blood and running from the scene at 3:40 a.m. The prosecution dropped charges against Presley three weeks later. Detective Santiago soon took a statement from Presley. Presley explained Det. Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Det. Santiago. Rather than showing Presley a real photo array, all seven photos that Det. Santiago showed Presley were of Swainson. Presley explained that he only testified against Swainson because he was coerced with threats of being charged for a separate drug crime. (Presley was charged under a different name, and the Commonwealth never disclosed the matter *Commonwealth v. Kareem Miller*, DC No. 881855934; CP-51-CR-1024751, to Mr. Swainson.) Mr. Swainson has a PCRA petition pending and is represented by counsel from Morgan Lewis.

h.  **Walter Ogrod** (CP-51-CR-0532781-1992). Mr. Ogrod, a trucker with a low-average IQ, was sentenced to death for the murder of a four-year-old girl based entirely on a "confession" Ogrod gave to Detective Devlin. Ogrod had driven all night and had not been to bed in 36 hours when Det. Devlin went to work. According to Det. Devlin, about an hour into the interrogation, Ogrod supposedly burst into tears and gave a 16-page confession. Ogrod, however, has claimed that he was interrogated for hours by Det. Devlin and a second detective. He finally broke from lack of sleep and began to believe what they detectives fed him—eventually signing the statement written out in longhand by Det. Devlin. After hearing Ogrod's testimony, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a

notorious jailhouse snitch, the state convicted Ogrod of capital murder. Mr.

Ogrod has a PCRA petition pending and is represented by counsel from Morgan

Lewis and the Federal Defender.

48.     At the time of the investigation and prosecution of Mr. Maldonado in 1992-1993,

the PPD had a policy, practice, or custom of detaining, arresting, and interrogating

purported witnesses without legal cause and with the intent of coercing statements from

these persons, under threat of punishment or other sanctions, and/or for material benefits.

These detentions and interrogations were conducted without voluntary consent and without

the benefit of advice of counsel, even where the purported witness and/or her attorney

sought the right to consult.

49.     This practice, as exemplified by the investigations in Mr. Maldonado's case and

those detailed above, continued for years due to the deliberate indifference of the PPD and

City of Philadelphia to this policy, practice, and custom. Finally, in 2014, after further

proof of this policy, practice, and custom was provided to the PPD, the District Attorney,

and the City, the PPD issued Directive 151 (January 1, 2014), that provided legal standards

for the detention and interview of witnesses and the detention and interrogation of suspects

by police detectives.

50.     During the 1980's and early 1990's, and concurrent with the time of the

investigation of this case by the PPD, there was within the Department a pattern, practice,

and custom of violating the constitutional rights of criminal suspects and others, including

systemic violations of the Fourth and Fourteenth Amendments. On three separate occasions

in the 1980's courts in the Eastern District of Pennsylvania issued orders enjoining the PPD

from engaging in these practices. *See Cliett v. City of Philadelphia*, C.A. No. 85-1846 (E.D.

Pa. 1985) (consent decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, C.A. No. 88-2264 (E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

51.     Thereafter in the late 1980's and early 1990's a narcotics squad operating out of the 39th Police District in Philadelphia engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the PPD, including the disregard of credible complaints to IAD and District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

52.     This systemic and unconstitutional practice and custom was ended only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office. As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Maldonado was charged, a Court in the Eastern District entered a Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in particular providing for specific limitations on the investigative practices and policies of the PPD. *See NAACP v. City of Philadelphia*, C.A. No. 96-6045.

53.     In summary, at the time of the investigation and prosecution of Marco Maldonado,

the PPD had a practice, policy, and custom of:

a. Engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, using improper identification procedures, and concealing and/or failing to disclose exculpatory evidence;

b. Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violate generally accepted police practices;

c. Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

d. d. Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

e. e. Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Mr. Maldonado.

54.    At the time of the investigation and prosecution of Marco Maldonado, and for many

years before and thereafter, the PPD and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The Internal Affairs Division (IAD) of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a.  excessive and chronic delays in resolving disciplinary complaints;

b.  a lack of consistent, rational and meaningful disciplinary and remedial actions;

c.  a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d.  the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e.  the PPD discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to the number of violations;

f.  the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.  a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.  serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i.  lack of an effective early warning system to identify, track, and monitor "problem" officers;

j.   IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct; interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.   IAD failed to acknowledge the disproportionate and extreme use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

## V.   CAUSES OF ACTION

**COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial Under the Fourteenth Amendment**
*Against All Individual Defendants*

55.   Plaintiff incorporates by reference all the foregoing paragraphs.

56.   The individual defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Mr. Maldonado of his clearly established constitutional right to due process of law and to a fair trial by:

**Count A – Fabrication:** The defendant officers fabricated, planted, and/or tampered with evidence including but not limited a) the planting of the handgun and bullet claimed to have seized form Mr. Maldonado, b) the fabricated probable cause for the arrest of Mr. Maldonado on December 28, 1992 and c) the false coerced confession of Mr. Maldonado; and

**Count B – Deliberate Deception:** The defendant officers deliberately deceived counsel and the court by concealing and/or suppressing relevant and material evidence linking suspects other than Mr. Maldonado to the murder of Gonzales, Sr.

57.   The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to

Mr. Maldonado's clearly established constitutional rights. No reasonable officer in 1992-1993 would have believed this conduct was lawful.

58.     Defendants' acts and omissions, as described above, were the direct and proximate cause of Mr. Maldonado's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Maldonado's wrongful trial at which he faced the death penalty, and the harms he sustained as a direct result.

### COUNT II: 42 U.S.C. §1983 Civil Rights Conspiracy
### *Against All Individual Defendants*

59.     Plaintiff incorporates by reference all the foregoing paragraphs.

60.     The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert to deprive Mr. Maldonado of his clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law, and to a fair trial.

61.     In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, but not limited to the following:

   a.   Fabricating evidence, planting evidence, tampering with evidence, and using coercion and/or threats to obtain incriminating witness statements;

   b.   Deliberately deceiving counsel and the court by concealing and/or withholding relevant and material evidence, fabricating evidence, tampering with evidence, and using coercion and/or threats to obtain inculpatory witness statements; and

   c.   Failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to believe Mr. Maldonado had committed the murder and ignoring evidence that exculpated Mr. Maldonado.

62.     Defendants' acts and omissions, as described above, were the direct and proximate

cause of Mr. Maldonado's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Maldonado's denial of due process and a fair trial.

### COUNT III: 42 U.S.C. § 1983 Failure to Intervene
### *Against All Individual Defendants*

63.   Plaintiff incorporates by reference all of the foregoing paragraphs.

64.   By their conduct, under color of state law and acting within the scope of their employment with the PPD, the individual defendants had opportunities to intervene on behalf of Mr. Maldonado to prevent the deprivation of liberty without due process of law and to ensure his right to a fair trial, but with deliberate indifference failed to do so.

65.   The defendants' failures to intervene violated Mr. Maldonado's clearly established constitutional right not to be deprived of liberty without due process of law and a fair trial as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1992-1993 would have believed that failing to intervene to prevent these defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, tampering with evidence, planting evidence, deliberately deceiving counsel and the court, failing to conduct a constitutionally adequate investigation, and causing Mr. Maldonado to be subjected to an unfair trial, were lawful.

66.   Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Maldonado's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Maldonado's unfair trial.

### COUNT IV: 42 U.S.C. § 1983 Municipal Liability Claim
### *Against Defendant City of Philadelphia*

67.   Plaintiff incorporates by reference all the foregoing paragraphs.

68.   The City of Philadelphia, by and through its final policymakers, had in force and

effect during time of Mr. Maldonado's arrest and trial, and for many years preceding and following the trial, a policy, practice, or custom of unconstitutional conduct in homicide and other criminal investigations, that included using coercive techniques in interviews and interrogations; fabricating evidence; fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, threats, and suggestion; tampering with evidence; planting evidence; concealing and/or withholding exculpatory evidence; and failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute.

69.    Policymakers for the City of Philadelphia had actual or constructive notice of the above practices, policies, and customs, but repeatedly failed to undertake any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations: withholding exculpatory evidence; fabricating inculpatory evidence; tampering with evidence; planting evidence; fabricating incriminating statements from witnesses, suspects, and arrestees; failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute; and failing to take appropriate remedial and/or disciplinary actions to curb the above misconduct.

70.    The unconstitutional municipal customs, practices and/or policies described above were the moving force behind Mr. Maldonado's trial for capital murder, and the other injuries and damages set forth in this Complaint.

### COUNT V: DAMAGES
### *Against All Defendants*

71.    Plaintiff incorporates by reference all the foregoing paragraphs.

72.    The unlawful, intentional, willful, deliberately deceptive, reckless, deliberately

indifferent, and/or malicious actions and omissions of all defendants caused Mr. Maldonado to be compelled to stand trial facing the death penalty which resulted in pain and suffering, mental anguish, emotional distress, restrictions on personal liberty, loss of freedom, deprivation of familial relationships, economic harms, and other associated damages.

### COUNT VI: PUNITIVE DAMAGES
### *Against All Individual Defendants*

73.     Plaintiff incorporates by reference all the foregoing paragraphs.

74.     The defendant officers acted willfully, deliberately, maliciously or with reckless disregard of the plaintiff's constitutional rights and punitive damages should therefore be awarded against the individual defendants.

WHEREFORE, Plaintiff Marco Maldonado requests the following relief:

   a.   Compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

   b.   Punitive damages to Plaintiff and against all individual Defendants, jointly and severally, in an amount to be determined at trial;

   c.   Pre-judgment and post-judgment interest and recovery of Plaintiffs costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 for all 42 U.S.C. §1983 claims;

   d.   Any and all other relief to which Plaintiff may be entitled; and

   e.   A jury trial as to each defendant and as to each count.


                    */s/ Kevin V. Mincey*
                    Kevin V. Mincey, Esquire
                    PA Attorney ID No.: 90201

_s/ Shawn K. Page_
Shawn K. Page, Esquire
PA Attorney ID No.: 313227

MINCEY FITZPATRICK ROSS, LLC
1650 Market Street
36th Floor
Philadelphia, PA 19103
(215) 587-0006
Counsel(s) for Plaintiff Marco Maldonado