**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARCO MALDONADO** | : | |
| **Plaintiff,** | : | **Civil Action No. 2:22-cv-3474** |
| | : | **JURY TRIAL DEMANDED** |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| **DETECTIVE MICHAEL CAHILL** | : | |
| **OFFICER BRUCE DOUGHERTY** | : | |
| **OFFICER BRUCE DENOBLE** | : | |
| **ROBERT CAMPOLONGO** | : | |
| **A.D.A. JOHN DOES** | : | |
| | : | |
| **Defendants.** | : | |

## AMENDED COMPLAINT

### I.      PRELIMINARY STATEMENT

1.      In October 1993, Plaintiff Marco Maldonado was wrongfully convicted and sentenced to life imprisonment for a crime he did not commit. More than twenty-seven years later, upon consideration of Mr. Maldonado's Post Conviction Relief Act petition, Mr. Maldonado's conviction was finally vacated. The Maldonado PCRA and wrongful conviction were uncontested by the Philadelphia District Attorney's Office, who agreed to both the vacating of the Maldonado life sentence and the grant of unsecure bail while Mr. Maldonado awaited a new trial. Mr. Maldonado subsequently pled no-contest to third degree murder after the Philadelphia District Attorney's Office threatened to reinstitute bail in this matter, which would have required Mr. Maldonado to await trial while in prison.

2.      Philadelphia police detectives and attorneys from the Philadelphia District Attorney's Office violated the constitutional rights of Mr. Maldonado leading to him being induced into an unknowing, unintelligent, and involuntary plea of guilt. This induced plea resulted in Mr. Maldonado unjustly serving nearly three decades in prison. Plaintiff brings this action under 42 U.S.C. §1983 seeking redress for the extraordinary misconduct of Defendants

1

Dougherty, DeNoble, Cahill, Campolongo and Doe(s), who coerced Mr. Maldonado's confession, fabricated evidence, engaged in deliberate deception by concealing and/or suppressing material evidence, employed unlawful investigative techniques, presented false testimony, and, together with other Philadelphia police officers, denied the plaintiff due process of law and a fair trial. The actions and conduct of the defendant officers were the results of policies, practices, customs, and deliberate indifference on the part of Defendant City of Philadelphia, including the failure to properly train and supervise officers assigned to investigate homicides, and the failure to take disciplinary and remedial action against the defendant detectives and other police officers who commit serious misconduct and abuses of authority.

## II.      JURISDICTION

3.      This action is brought pursuant to 42 U.S.C. §1983. Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343(1), (3), (4) and the aforementioned statutory provision. Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367(a) to adjudicate state law claims.

## III.      PARTIES

4.      Plaintiff Marco Maldonado is a resident of Philadelphia, Pennsylvania and at all times relevant to this action was in the Eastern District of Pennsylvania.

5.      Defendant City of Philadelphia is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department and the Philadelphia District Attorney's Office. At all times relevant the Philadelphia Police Department employed Defendants Bruce Dougherty, Bruce DeNoble, and Michael Cahill. At all times relevant the Philadelphia District Attorney's Office employed defendants Robert Campolongo, and John Doe(s).

6.      Defendants Dougherty, DeNoble, and Cahill ("the defendant officers") were at all

times relevant to this action police officers or detectives for the Philadelphia Police Department acting under color of state law. The defendant officers are being sued in their individual capacities.

7.    Defendant Campolongo and John Doe(s)("the defendant ADAs") were at all times relevant to this action Assistant District Attorneys for the Philadelphia District Attorney's Office acting under color of state law. The defendant ADAs are being sued in their individual capacities.

8.    The designation "John Doe" is one of a fictious person or entity.

9.    At all relevant times, all defendants were acting in concert and conspiracy and their actions deprived the plaintiff of his constitutional and statutory rights.

## IV.    FACTUAL ALLEGATIONS

### The Murder

10.    On December 23, 1992, Alberto Gonzales Sr. ("Gonzales Sr.") was found shot to death in his home.

11.    Gonzales Sr. was found dead in the second-floor front bedroom of his home at 2831 North Orkney Street in Philadelphia after he was shot once in the shoulder. The victim's son, Alberto Gonzales Jr. ("Gonzales Jr."), found his father's body, and a neighbor called the police.

### The Police Investigation

12.    On December 24, 1992, Mr. Maldonado was charged with violation of the Uniform Firearm Act and posted bail the same day; he was not a suspect in the murder at that time.

13.    In a police report dated December 24, 1992, Police officers Dougherty and DeNoble allege to have seen Plaintiff removing a handgun from his jacket and tossing it into an abandoned car. They also claimed that a single .38 bullet was found in plaintiff's pocket. The firearm purported to be recovered by Dougherty and DeNoble was later alleged to be weapon used to kill Mr. Gonzalez, Sr.

14.    Mr. Maldonado never possessed the firearm or bullet alleged to have been recovered from him on December 24, 1992.

15.    The circumstances surrounding the recovery of both the firearm and the .38 caliber bullet were fabricated by Defendants Dougherty and DeNoble.

16.    Defendant Police Officers DeNoble and Dougherty were subsequently terminated by the Philadelphia Police Department for planting and fabricating evidence.

17.    Defendant Cahill was a detective assigned to investigate the murder of Mr. Gonzalez, Jr.

18.    Defendants Campolongo and Doe(s) was/were assigned to handle the prosecution of Mr. Maldonado by the Philadelphia District Attorney's Office.

19.    On or about December 24, 1992, Alberto Gonzalez, Jr., was detained by the Homicide Division of the Philadelphia Police Department as the initial suspect in the Gonzalez, Sr., murder.

20.    Gonzalez, Jr., was released on or about December 26, 1992.

21.    Defendant Police Officers and Defendant ADA Campolongo failed to disclose any information regarding this alternative suspect, his detention, or statements to trial counsel with the Maldonado discovery.

22.    On December 26, 1992, Mayra Camacho was taken to the Homicide Division of the Philadelphia Police Department by the recently released Alberto Gonzalez, Jr. and Nestor Sanchez to give a witness statement regarding the Gonzalez, Sr., murder.

23.    When interviewed by detectives, Mayra Camacho stated that she witnessed Mr. Maldonado enter the rear of Gonzales Sr.'s home "from up the block." After said entry, Camacho stated that she heard two gunshots and observed Mr. Maldonado exit the front of the Gonzalez, Sr. home.

24. At the time, Ms. Camacho was the only witness for the Commonwealth.

25. Defendant Cahill then questioned Mr. Maldonado, 19 years old and clearly under the influence of drugs, at police headquarters for approximately 18 hours about Gonzales Sr.'s murder.

26. During the interrogation by Defendant Cahill, Mr. Maldonado gave both an exculpatory and inculpatory statements. Mr. Maldonado was so intoxicated at the time the statements were given that he does not remember giving either statement or signing the inculpatory statement.

27. The Maldonado exculpatory statement was never passed by Defendants ADA Campolongo and/or Doe(s) in discovery.

28. There was no forensic evidence linking Mr. Maldonado to the murder and only one person, Mayra Camacho, of the many people interviewed claimed that they saw Mr. Maldonado near Gonzales Sr.'s home near the time of the murder.

29. On September 30, 2017, witness Mayra Camacho provided an affidavit recanting her prior statement implicating Mr. Maldonado in the murder of Alberto Gonzales Sr.

30. It was not until Camacho's recantation that Mr. Maldonado learned that the police had suspected Gonzales Jr. in his father's death until Camacho shifted the blame. This exculpatory information was never disclosed to the defense by Defendants ADA Campolongo and/or Doe(s), nor were any statements provided by Gonzales Jr. or any other evidence that may have led to the police's initial suspicion that he had killed Gonzales Sr., in blatant violation of the prosecution's duties under *Brady*.

31. The Philadelphia Police Department recovered fingerprint evidence at the home of Gonzalez Sr., however actual evidence and comparisons results were never passed to defense in discovery by Defendants ADA Campolongo and/or Doe(s).

32. Defendants ADA Campolongo and/or Doe(s) also withheld evidence of an

investigation into police Officers Bruce Dougherty and Bruce DeNoble, who were dismissed for corruption only months after they participated in Maldonado's conviction.

33.    Prior to his trial date, Plaintiff Maldonado agreed to plea to Murder in the Second Degree and Defendants ADA Campolongo and/or Doe(s) agreed not to proceed against Plaintiff on Murder in the First Degree or a potential death sentence.

34.    Plaintiff Marco Maldonado was sentenced to Life Imprisonment.

35.    Following his conviction, Mr. Maldonado continued to gather new evidence about his case and litigate *pro se* for his freedom.

36.    In November 2017, the Third Circuit issued an order granting leave to file a second or successive habeas petition with respect to (1) a claim under *Brady v. Maryland* and (2) a freestanding claim of actual innocence.

37.    After more than twenty-seven years, upon consideration of Mr. Maldonado's habeas petition and his latest Post Conviction Relief Act petition, the Philadelphia District Attorney's Office did not contest Mr. Maldonado's PCRA petition. Mr. Maldonado's conviction was vacated, and the Philadelphia District Attorney's Office withdrew the charges of first and second-degree murder. Mr. Maldonado was released on $10,000 unsecured bail while awaiting a new trial on third degree murder.

38.    Following his release from prison, Mr. Maldonado was subsequently presented with an offer to plead no-contest to third degree murder or in the alternative, return to prison to await trial.

39.    Mr. Maldonado, having been free from his unlawful imprisonment for six months after spending 27 years in prison for a crime he did not commit, did not wish to return to prison under any circumstances.

40.    Mr. Maldonado was constructively coerced by the Philadelphia District Attorney's Office to enter a plea of no-contest to third degree murder when faced with the prospect of returning to jail for an undetermined period to await a new trial even though he was confident that he would

be successful in gaining an acquittal at a trial.

41.    On April 19, 2021, Mr. Maldonado pled no-contest to third degree murder and was found guilty. Mr. Maldonado was sentenced to 10 to 20 years of state incarceration, however, since Mr. Maldonado received credit for twenty-seven years he previously served as a result of the conduct of the defendants, he was released from the courtroom and returned home to his family that evening without any court supervision.

42.    The actions and conduct of the individual defendants as described above violated the plaintiff's Fourteenth Amendment right to due process of law and a fair trial.

43.    The fabrication of and tampering with evidence by the defendant officers violated the plaintiff's right to due process of law and a fair trial.

44.    The Defendant Officers and/or ADA Campolongo and/or Doe(s) were deliberately deceptive by concealing and/or suppressing critical evidence violating Mr. Maldonado's right to due process of law and a fair trial.

45.    Defendants' failure to conduct a reasonably thorough investigation that considered evidence negating the existence of grounds to prosecute Mr. Maldonado, denied the plaintiff due process and a fair trial.

46.    As a result of the actions and inactions of the defendant officers, Marco Maldonado was compelled to stand trial in a capital murder case, causing him substantial harms.

**The PPD's pattern and practice of unconstitutional misconduct in homicide investigations, including the fabrication of evidence, coercion and threats to secure false statements from witnesses and suspects, failure to conduct proper investigations, and suppression of exculpatory evidence.**

47.    For many years dating back at least to the 1970's, and continuing well beyond the time of the investigation of Gonzales, Sr.'s murder, the City of Philadelphia, had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain incriminating

7

evidence; fabricating inculpatory evidence; conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees.

48.    This policy, practice, or custom involved the use of various techniques to coerce incriminating statements, including without limitation: isolation; separating juvenile or otherwise vulnerable suspects or witnesses from friends and family; subjecting individuals to needlessly prolonged interrogations; making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement and/or be given favorable treatment; the use or threat of physical violence; authoritative assertions of a suspect's guilt, including without limitation confrontation with false inculpatory evidence; and providing false assurances—including to juveniles and other vulnerable people—that the suspect or witness will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

49.    These practices were well known to the City of Philadelphia and its policymakers with respect to criminal investigations and prosecutions as a result of newspaper investigations including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

50.    Various cases demonstrate that this misconduct was pervasive within the Philadelphia Police Department at time of Mr. Maldonado's 1993 trial, and, upon information and belief, the misconduct described below was committed with the knowledge of Homicide Unit and PPD supervisors or because of their deliberate indifference to this misconduct.

a. **Anthony Wright** (CP-51-CR-1131582-1991). Mr. Wright had been convicted of the rape and murder of an elderly woman based on misconduct by homicide

detectives including the tampering with evidence, coercive witness interrogation, planting evidence and numerous other actions that denied Mr. Wright a fair trial. After spending nearly twenty-five years in prison, Mr. Wright was exonerated by DNA evidence.

b. **Carlos Hernandez** (CP-51-CR-0302131-1991) & Ed Williams. A woman and her boyfriend were robbed at gunpoint by two men and her boyfriend was shot. Detectives interrogated a key witness, Juan Sanchez, and extracted a statement from him implicating Carlos Hernandez and another man. Mr. Sanchez described the circumstances of his statement as follows: the detective held him in custody and interrogated him for three days, without food or water; he was denied use of the bathroom and had to urinate on the floor; the detective hit him several times. After coercing Mr. Sanchez's statement, the detective interrogated Mr. Hernandez and obtained a statement from him implicating Ed Williams. Mr. Hernandez described the circumstances of his statement as follows: the detective had him handcuffed to a chair and held him without water, food, or use of a bathroom; the detective punched him in the face and pressed his foot on Mr. Hernandez's crotch until he relented and signed the statement. Later it was proved that Mr. Williams was in a secured drug treatment facility at the time of the crime.

c. **Jackie Combs Jr.** PPD detectives, coerced four young witnesses into testifying against Mr. Combs for a murder that he denies committing. One of those witnesses, just 15 at the time, has told reporters that she felt "it's my fault, because I changed my story, saying this man killed this guy [and] knowing he

didn't do it." The witnesses, who gave varied accounts of the killing, have explained

that their statements were the result of physical and verbal abuse by detectives.

d. **Willie Veasy** (CP-51-CR-0641521-1992). Mr. Veasy was convicted of a murder

that occurred in South Philadelphia while he was working at a popular and busy

restaurant. Mr. Veasy was interrogated by detectives until he provided a

"confession." Mr. Veasy has described that the detective isolated him in an

interrogation room where the detective smacked him around and kicked his

testicles several times until Mr. Veasy agreed to sign the "confession."

e. **Percy St. George** (CP-51-CR-1012571-1993). In investigating a murder, the

detective obtained a statement from a witness who, because there were warrants

out for his arrest, signed the statement under a friend's name: David Glenn. As

trial approached, PPD officers picked up the actual David Glenn. At the station,

the detective coerced the real David Glenn into signing a new false statement

saying he saw the crime and identifying Mr. St. George from a sham photo

array prepared by the detective. After David Glenn testified regarding the

detective's misconduct and disavowed the statement the detective had coerced

him to sign, the detective notified the Court and the Commonwealth of his

intention to assert his 5th Amendment right against self-incrimination to avoid

having to testify about his actions in that case. Shortly after receiving this letter

from the detective's counsel, the prosecution dismissed all charges against St.

George, but the detective remained with the PPD through September 1996.

f. **Donald Ray Adams** (CP 51-CR-0743812-1991). Mr. Adams was charged and

convicted in the 1990 murders of Darryl Patterson and Thomas Winn. The initial investigation of the case did not produce a suspect and in June, 1991 PPD Detectives David Clark and Igor Alfimow were assigned to re-investigate the matter. These detectives secured a statement from an alleged witness, Donna Benjamin, implicating Mr. Adams. Based almost entirely on this testimony, Mr. Adams was convicted and sentenced to life imprisonment. In fact, the statement from Ms. Benjamin was coerced and false and some years later she recanted. In 2007, the Court of Common Pleas granted post- conviction relief based on the testimony of Ms. Benjamin that the detectives threatened her with incarceration, promised that her open criminal charges would be dismissed, and offered her financial and other material support for her testimony. The detectives ignored the fact that other witnesses provided physical descriptions of the assailant as over six feet tall, thin, light skinned and in his 20's. Mr. Adams was 5'4", 200 pounds, dark skinned and in his 30's. Moreover, there was evidence pointing towards another "Don Ray" (Don Ray Bennett) who lived in the neighborhood, fit the description of the assailant, and whose family had been in disputes with the victims. Indeed, Ms. Benjamin stated that it was Don Ray Bennett in her recantation. At a retrial, Mr. Adams was acquitted of all charges. In a subsequent civil suit for malicious prosecution, the matter was settled and Mr. Adams received compensation for his wrongful conviction.

g. **Andrew Swainson** (CP-51-CR-0431331-1988). In 1989, Andrew Swainson was convicted of murder on the statement of a single eyewitness, Paul Presley— an original suspect arrested for the shooting moments after it occurred, covered in blood and running from the scene at 3:40 a.m. The prosecution dropped

charges against Presley three weeks later. Detective Santiago soon took a statement from Presley. Presley explained Det. Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Det. Santiago. Rather than showing Presley a real photo array, all seven photos that Det. Santiago showed Presley were of Swainson. Presley explained that he only testified against Swainson because he was coerced with threats of being charged for a separate drug crime. (Presley was charged under a different name, and the Commonwealth never disclosed the matter *Commonwealth v. Kareem Miller*, DC No. 881855934; CP-51-CR-1024751, to Mr. Swainson.) Mr. Swainson has a PCRA petition pending and is represented by counsel from Morgan Lewis.

    **f.**   **Walter Ogrod** (CP-51-CR-0532781-1992). Mr. Ogrod, a trucker with a low-average IQ, was sentenced to death for the murder of a four-year-old girl based entirely on a "confession" Ogrod gave to Detective Devlin. Ogrod had driven all night and had not been to bed in 36 hours when Det. Devlin went to work. According to Det. Devlin, about an hour into the interrogation, Ogrod supposedly burst into tears and gave a 16-page confession. Ogrod, however, has claimed that he was interrogated for hours by Det. Devlin and a second detective. He finally broke from lack of sleep and began to believe what they detectives fed him—eventually signing the statement written out in longhand by Det. Devlin. After hearing Ogrod's testimony, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Mr. Ogrod has a PCRA petition pending and is represented by counsel from Morgan

Lewis and the Federal Defender.

48.     At the time of the investigation and prosecution of Mr. Maldonado in 1992-1993, the PPD had a policy, practice, or custom of detaining, arresting, and interrogating purported witnesses without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, and/or for material benefits. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and/or her attorney sought the right to consult.

49.     This practice, as exemplified by the investigations in Mr. Maldonado's case and those detailed above, continued for years due to the deliberate indifference of the PPD and City of Philadelphia to this policy, practice, and custom. Finally, in 2014, after further proof of this policy, practice, and custom was provided to the PPD, the District Attorney, and the City, the PPD issued Directive 151 (January 1, 2014), that provided legal standards for the detention and interview of witnesses and the detention and interrogation of suspects by police detectives.

During the 1980's and early 1990's, and concurrent with the time of the investigation of this case by the PPD, there was within the Department a pattern, practice, and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments. On three separate occasions in the 1980's courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in these practices. *See Cliett v. City of Philadelphia*, C.A. No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, C.A. No. 88-2264 (E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

50.    Thereafter in the late 1980's and early 1990's a narcotics squad operating out of the 39th Police District in Philadelphia engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the PPD, including the disregard of credible complaints to IAD and District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

51.    This systemic and unconstitutional practice and custom was ended only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office. As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Maldonado was charged, a Court in the Eastern District entered a Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in particular providing for specific limitations on the investigative practices and policies of the PPD. *See NAACP v. City of Philadelphia*, C.A. No. 96-6045.

52.    In summary, at the time of the investigation and prosecution of Marco Maldonado,

the PPD had a practice, policy, and custom of:

a.  Engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, using improper identification procedures, and concealing and/or failing to disclose exculpatory evidence;

b.  Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violate generally accepted police practices;

c.  Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

d.  Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

e.  Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Mr. Maldonado.

53.    At the time of the investigation and prosecution of Marco Maldonado, and for many

years before and thereafter, the PPD and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The Internal Affairs Division (IAD) of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

 a. excessive and chronic delays in resolving disciplinary complaints;

 b. a lack of consistent, rational and meaningful disciplinary and remedial actions;

 c. a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

 d. the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

 e. the PPD discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to the number of violations;

 f. the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

 g. a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

 h. serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

 i. lack of an effective early warning system to identify, track, and monitor "problem" officers;

j.   IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct; interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.   IAD failed to acknowledge the disproportionate and extreme use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

## V.    CAUSES OF ACTION

**COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial Under the Fourteenth Amendment**
***Against All Individual Defendants***

54.   Plaintiff incorporates by reference all the foregoing paragraphs.

55.   The individual defendants, acting individually and in concert, and within the scope of their employment, deprived Mr. Maldonado of his clearly established constitutional right to due process of law and to a fair trial when:

a)   The defendant officers fabricated, planted, and/or tampered with evidence including but not limited to the planting of the handgun and bullet alleged to have been seized from Mr. Maldonado on December 24, 1992

b)   The defendant officers fabricated probable cause for the arrest of Mr. Maldonado on December 28, 1992

c)   Interrogated a clearly intoxicated Mr. Maldonado for hours and crafting a confession from Mr. Maldonado's intoxicated statements; and

d)   The defendant officers and/or Defendants Campolongo and/or Doe(s) deliberately deceived counsel and the court by concealing and/or suppressing relevant and material evidence linking suspects other than Mr. Maldonado to the murder of

Gonzales, Sr.

56.      The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Maldonado's clearly established constitutional rights. No reasonable officer or attorney in 1992- 1993 would have believed this conduct was lawful.

57.      Defendants' acts and omissions, as described above, were the direct and proximate cause of Mr. Maldonado's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Maldonado's wrongful trial at which he faced the death penalty, and the harms he sustained as a direct result.

## COUNT II: 42 U.S.C. §1983 Civil Rights Conspiracy
### *Against All Individual Defendants*

58.      Plaintiff incorporates by reference all the foregoing paragraphs.

59.      The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert to deprive Mr. Maldonado of his clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law, and to a fair trial.

60.      In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts,.

61.      Defendants' acts and omissions, as described above, were the direct and proximate cause of Mr. Maldonado's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Maldonado's denial of due process and a fair trial.

## COUNT III: 42 U.S.C. § 1983 Failure to Intervene
### *Against All Individual Defendants*

62.      Plaintiff incorporates by reference all of the foregoing paragraphs.

63.      By their conduct, under color of state law and acting within the scope of their employment with the PPD and the Philadelphia District Attorney's Office, the individual defendants

18

had opportunities to intervene on behalf of Mr. Maldonado to prevent the deprivation of liberty without due process of law and to ensure his right to a fair trial, but with deliberate indifference failed to do so.

64.    The defendants' failures to intervene violated Mr. Maldonado's clearly established constitutional right not to be deprived of liberty without due process of law and a fair trial as guaranteed by the Fourteenth Amendment. No reasonable police officer or attorney in 1992-1993 would have believed that failing to intervene to prevent these defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, tampering with evidence, planting evidence, suppressing and concealing material evidence from Mr. Maldonado and his trial counsel, failing to conduct a constitutionally adequate investigation, and causing Mr. Maldonado to be subjected to an unfair trial, were lawful.

65.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Maldonado's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Maldonado's unfair trial.

### COUNT IV: 42 U.S.C. § 1983 Municipal Liability Claim
### *Against Defendant City of Philadelphia*

66.    Plaintiff incorporates by reference all the foregoing paragraphs.

67.    The City of Philadelphia, by and through its final policymakers, had in force and effect during time of Mr. Maldonado's arrest and trial, and for many years preceding and following the trial, a policy, practice, or custom of unconstitutional conduct in homicide and other criminal investigations, that included using coercive techniques in interviews and interrogations; fabricating evidence; fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, threats, and suggestion; tampering with evidence; planting evidence; concealing and/or withholding exculpatory evidence; and failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute.

68.     Policymakers for the City of Philadelphia had actual or constructive notice of the above practices, policies, and customs, but repeatedly failed to undertake any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations: withholding exculpatory evidence; fabricating inculpatory evidence; tampering with evidence; planting evidence; fabricating incriminating statements from witnesses, suspects, and arrestees; failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute; and failing to take appropriate remedial and/or disciplinary actions to curb the above misconduct.

69.     The unconstitutional municipal customs, practices and/or policies described above were the moving force behind Mr. Maldonado's trial for capital murder, and the other injuries and damages set forth in this Complaint.

### COUNT V: DAMAGES
*Against All Defendants*

70.     Plaintiff incorporates by reference all the foregoing paragraphs.

71.     The unlawful, intentional, willful, deliberately deceptive, reckless, deliberately indifferent, and/or malicious actions and omissions of all defendants caused Mr. Maldonado to be compelled to stand trial facing the death penalty which resulted in pain and suffering, mental anguish, emotional distress, restrictions on personal liberty, loss of freedom, deprivation of familial relationships, economic harms, and other associated damages.

### COUNT VI: PUNITIVE DAMAGES
*Against All Individual Defendants*

72.     Plaintiff incorporates by reference all the foregoing paragraphs.

73.     The defendant officers acted willfully, deliberately, maliciously or with reckless disregard of the plaintiff's constitutional rights and punitive damages should therefore be awarded against the individual defendants.

WHEREFORE, Plaintiff Marco Maldonado requests the following relief:

a. Compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b. Punitive damages to Plaintiff and against all individual Defendants, jointly and severally, in an amount to be determined at trial;

c. Pre-judgment and post-judgment interest and recovery of Plaintiffs costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 for all 42 U.S.C. §1983 claims;

d. Any and all other relief to which Plaintiff may be entitled; and

e. A jury trial as to each defendant and as to each count.

/s/ Kevin V. Mincey
Kevin V. Mincey, Esquire
PA Attorney ID No.: 90201

/s/ Shawn K. Page
Shawn K. Page, Esquire
PA Attorney ID No.: 313227

MINCEY FITZPATRICK ROSS, LLC
1650 Market Street
36th Floor
Philadelphia, PA 19103
(215) 587-0006
Counsel for Plaintiff Marco Maldonado